# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 41832

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **2015 Opinion No. 11** |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Filed: February 25, 2015** |
| | ) | |
| **v.** | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **VICTORIA BEA MORIN,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Michael R. McLaughlin, District Judge; Hon. Theresa Gardunia, Magistrate.

Decision of district court on intermediate appeal affirming judgment of conviction for driving under the influence of drugs, <u>affirmed</u>.

Alan Trimming, Ada County Public Defender; Heidi M. Johnson, Deputy Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Jessica M. Lorello, Deputy Attorney General, Boise, for respondent.

_____

LANSING, Judge

Following a jury trial, Victoria Bea Morin was convicted of driving while under the influence of drugs. On appeal, Morin argues that the magistrate court erred by denying her motion to compel the State to produce a more detailed disclosure of anticipated expert witness testimony and by denying her motion to exclude a blood test showing the presence of carboxy-THC, an inactive metabolite of marijuana.

1

# I.

## BACKGROUND

Morin was charged with operating a vehicle while under the influence of drugs in violation of Idaho Code § 18-8004(1)(a).[1] Prior to trial, she filed a motion to compel a discovery response and a motion in limine to exclude evidence. In the motion to compel, Morin argued that the State had failed to provide a "written summary or report" relating to any expert witness testimony it would present at trial, as required by Idaho Criminal Rule 16(b)(7). In the motion in limine, Morin sought to exclude any test results showing the presence of carboxy-THC in Morin's blood and any testimony linking carboxy-THC and intoxication. Both of these motions were denied and the case proceeded to trial.

According to the testimony at Morin's trial, the charge arose from the following facts. Morin was parked just off of a major roadway with her hazard lights activated when another driver stopped to help. The other driver testified that Morin had slurred speech, "had a hard time logically explaining what was going on," and "didn't seem quite right." Morin asked for help getting to a gas station, but the other driver called law enforcement because she was concerned that Morin could not safely operate a vehicle.

Corporal Jayne, an Idaho State Police officer and a certified Drug Recognition Evaluator, was sent to the scene. Morin told the officer that she had been driving and had run out of gas. According to his testimony, Jayne made several observations that led him to believe that Morin was intoxicated or otherwise impaired: Morin had dilated pupils and white crust on her lips; her speech was slurred and her responses were strange and often inappropriately emotional; and, she was unable to complete simple tasks like finding her wallet. Consequently, the officer decided to administer field sobriety tests. He concluded that Morin had failed the "walk and turn" test and the "one leg stand" test. These tests indicated that she might be under the influence of alcohol, but Jayne did not observe any abnormalities indicative of alcohol intoxication during a horizontal gaze nystagmus test. The officer therefore believed that Morin was under the influence of a substance other than alcohol. He confirmed this by administering a breath test that showed that Morin had not been consuming alcohol. The officer then asked Morin to complete additional

---

[1] The State also brought a charge relating to the status of Morin's driver's license, but that charge is not at issue in this appeal.

tests to determine what category of drug Morin had used. In one test, the officer observed a "lack of convergence" of Morin's eyes. In that test, a sober person's eyes cross, i.e., they converge, as they focus on an item that the officer moves closer to the person's face. Morin's eyes did not cross. The officer also observed that Morin had significant difficulties estimating time, failed the finger-to-nose test, had eye tremors and dilated pupils, and had a "yellow-green paste" on her tongue. Finally, both Jayne and another officer detected the odor of burnt marijuana.[2]

In addition to making these physical observations, Jayne asked Morin if she had taken any drugs, and Morin reported that she had taken several drugs, including a few prescribed psychotropic medications. She also acknowledged using marijuana, first stating that she had used it nine days earlier and then amending her description to say that she had used marijuana the prior weekend, which would have been five to seven days earlier.

Upon considering his observations and the drugs Morin had reported using, Corporal Jayne concluded that marijuana was the drug most significantly affecting Morin. He knew that a "lack of convergence" indicates intoxication by central nervous system depressants, inhalants, dissociative anesthetics, or marijuana. He believed that several of those categories could be excluded. For example, Morin did not exhibit the rigid muscle tone that is caused by dissociative anesthetics, such as PCP, and she did not display horizontal gaze nystagmus, which central nervous system depressants usually cause. After considering all of these factors, Jayne concluded that Morin was under the influence of marijuana. He obtained a blood sample in order to confirm his opinion.

The forensic scientist who analyzed the blood sample at the Idaho State Police lab explained that the lab did not look for tetrahydrocannabinol (THC), the active ingredient in marijuana, or any active metabolite[3] of THC, because the lab equipment used was not

---

[2]     Jayne smelled marijuana on Morin's clothes, long after they had left the scene. The other officer smelled burnt marijuana inside the car.

[3]     As explained at the trial, the chemical components of a drug are broken down by the body's normal metabolic processes. The chemicals formed by these reactions are described as "metabolites." "Active metabolites" have independent pharmacological effects and "inactive metabolites" are chemicals that the body has rendered pharmacologically inert. *See also State ex rel. Montgomery v. Harris*, 322 P.3d 160 (Ariz. 2014) (discussing various metabolites of marijuana).

3

sufficiently sensitive. The lab did find venlafaxine (a drug sold under the trade name Effexor), an active metabolite of venlafaxine, an amphetamine, and carboxy-THC. Carboxy-THC is an inactive metabolite of marijuana that has no pharmacological effects and is, therefore, not a cause of intoxication. Rather, it can be detected in a blood sample for at least ten days and up to a month after a person uses marijuana, long after the person ceases to be intoxicated.

The jury returned a guilty verdict. Morin appealed to the district court, raising three claims of error: (1) the magistrate court erred by denying her motion to compel an adequate discovery response; (2) in light of the inadequacy of the State's discovery response, the admission of Dr. Dawson's testimony amounted to a denial of due process; and (3) the magistrate court erred by denying the motion in limine to exclude the carboxy-THC evidence. The district court held that (1) the magistrate court erred by denying the motion to compel, but that the denial was harmless; (2) the claim of error relating to the admission of Dr. Dawson's testimony failed, to the extent it was distinguishable from the first claim, because Morin could not show fundamental error; and (3) the magistrate court had correctly held the evidence regarding carboxy-THC relevant and admissible.

Morin further appeals, raising the same issues that were presented to the district court.

## II.

## ANALYSIS

When reviewing the decision of a district court sitting in its appellate capacity, we do not directly review the decision of the magistrate court; rather, we are procedurally bound to affirm or reverse the decisions of the district court. *Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012); *State v. Korn*, 148 Idaho 413, 415 n.1, 224 P.3d 480, 482 n.1 (2009). We review the magistrate court record, however, to determine whether the district court was correct in affirming or reversing the factual findings or legal conclusions of the magistrate court. *Pelayo v. Pelayo*, 154 Idaho 855, 858-59, 303 P.3d 214, 217-18 (2013); *Bailey*, 153 Idaho at 529, 284 P.3d at 973.

**A.     The State's Discovery Response**

Idaho Criminal Rule 16 defines the discovery and disclosure obligations of the prosecution in a criminal case. Rule 16(b)(7) states, in relevant part:

> Upon written request of the defendant the prosecutor shall provide a written summary or report of any testimony that the state intends to introduce pursuant to Rules 702, 703 or 705 of the Idaho Rules of Evidence at trial or hearing. The

4

summary provided must describe the witness's opinions, the facts and data for those opinions, and the witness's qualifications.

The State's response to Morin's request for expert witness disclosures stated:

Dr. Dawson is an expert in toxicology and pharmacology and will assist the trier of fact in understanding the evidence regarding the effects of drugs on the behavior and performance of the defendant as reported in this case. Dr. Dawson will utilize known and generally accepted scientific principles of absorption, distribution, metabolization and excretion of drugs. Testimony may include information on the effects of the drugs consumed by the defendant in this case and the possible effects of said drugs.

Morin filed a motion in limine to compel a more specific response to her discovery requests because she anticipated that the State would proffer Dr. Dawson's opinion that Morin was under the influence of an intoxicating substance and, in the defense's view, neither the opinion itself nor the basis for the opinion had been disclosed. The magistrate court held that the State's response was sufficient and denied Morin's motion.

At trial, Dr. Dawson explained the pharmacological import of Corporal Jayne's observations and the blood tests. He opined that dilated pupils, confusing speech patterns, impairments to balance and other psychomotor function, "lack of convergence," and a green coating of the tongue were all diagnostic indications of marijuana intoxication exhibited by Morin. Dr. Dawson also described the physiological effects of the other drugs found in Morin's blood test. Finally, as Morin anticipated, the State solicited Dr. Dawson's opinion:

Q. And based on your observations--your review of the reports, your observations of the field sobriety tests, do you have an opinion regarding whether or not the defendant was intoxicated on February 24, 2012?
A. Yes.
Q. What is that opinion?
A. I believe the defendant was impaired and was unsafe to operate a motor vehicle.

Like the district court, we conclude that the magistrate erred in holding that the State's discovery response complied with Rule 16(b)(7). The plain text of Rule 16(b)(7) requires the disclosure of expert witness "opinions," the "facts and data for those opinions," and also "any testimony that the State intends to introduce pursuant to Rules 702, 703 or 705 of the Idaho Rules of Evidence." That encompasses not only an expert's opinion but also "scientific, technical, or other specialized knowledge" to which a qualified witness may testify in a form

5

other than an opinion. *See* I.R.E. 702. Here, Morin's discovery requests sought disclosure of "any testimony that the State intends to introduce pursuant to Rules 702, 703 or 705 of the Idaho Rules of Evidence . . . including the witnesses' opinions, the facts and data for those opinions, and the witnesses' qualifications." The State's response disclosed none of those things other than Dr. Dawson's qualifications (provided via a copy of his curriculum vitae). The generic response vaguely described the subject matter, not the content, of Dr. Dawson's anticipated testimony. It did not disclose one fact or opinion to which he would testify. As federal courts applying the analog federal criminal rule have held, a mere list of topics or general subject matter about which an expert witness may testify is not a discovery response that complies with the rule. *United States v. Beavers*, 756 F.3d 1044, 1054 (7th Cir. 2014); *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001); *United States v. White*, 492 F.3d 380, 407 (6th Cir. 2007); *see also Murphy-Bey v. United States*, 982 A.2d 682, 688 (D.C. Cir. 2009) (applying the analogous District of Columbia rule and concluding that a list of topics is not a summary of a witness's opinions).

Even if the State did not know what some of the details of Dr. Dawson's testimony would be at the time of the initial discovery response, I.C.R. 16(j) imposes a continuing duty to supplement the response if a party later discovers or decides to use additional evidence. Discovery rules are drafted to safeguard the truth-seeking function of trials. The rules are designed to "promote fairness and candor," "facilitate fair and expedient pretrial fact gathering," and "prevent surprise at trial." *Edmunds v. Kraner*, 142 Idaho 867, 873-78, 136 P.3d 338, 344-49 (2006) (discussing similar rules applicable to civil cases); *see also* cmt. 1993 Amendment to Federal Rule of Criminal Procedure 16 ("The amendment [requiring the disclosure of expert opinion testimony] is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination."). These purposes are not accomplished by a generic discovery response of the type presented here.

The State argues, however, that under the Idaho Supreme Court's decision in *State v. Koch*, 157 Idaho 89, 334 P.3d 280 (2014), its discovery response was adequate. In *Koch*, the defendant was charged with lewd conduct with a minor. The State's discovery response described the anticipated testimony of its expert, Mydell Yeager, as follows:

Ms. Yeager's curriculum vitae is attached. She'll testify to the dynamics of delayed disclosure as it relates to child sexual abuse. The state intends to elicit expert testimony from Mydell Yeager regarding behavior of children who have been sexually abused and Ms. Yeager will testify that it is rare that a child immediately discloses their sexual abuse especially when they know the perpetrator. Ms. Yeager will testify about the dynamics of child sexual abuse as it relates to grooming a victim, keeping the abuse secret, the effects and threats on whether a child chooses to disclose.

*Id.* at 93-94, 334 P.3d at 284-85. Prior to trial, the defendant argued that this disclosure was insufficient, and the court overruled the objection. On appeal, Koch argued that the State's disclosure was not an adequate summary of Yeager's opinion and that the State had not disclosed the facts and data for those opinions as required by I.C.R. 16(b)(7). The Supreme Court disagreed. The Court noted that the disclosure informed Koch of the main opinion to which Yeager was going to testify, and while it did not specifically disclose that Yeager's opinions were based on her training and experience, "which would be the better practice," it did provide her curriculum vitae that presumably disclosed her education and experience. *Koch*, 157 Idaho at 95, 334 P.3d at 286. So far as disclosed by the Supreme Court's opinion, the defendant did not argue that Yeager testified to any other significant opinions that were not set forth in the discovery response or other scientific or technical information for which disclosure was required by Rule 16(b)(7). Thus, in *Koch*, the State's discovery response actually did provide a summary of the testimony for which disclosure was required.

Here, by contrast, the State's discovery response divulged no component of Dr. Dawson's testimony, and certainly not the opinion to which he ultimately testified, that Morin "was impaired and was unsafe to operate a motor vehicle." Therefore, we hold that the district court correctly concluded that the magistrate court erred in denying Morin's motion to compel a more adequate discovery response.

We next must review the district court's determination that this error was harmless. Idaho Criminal Rule 52 provides that "any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." The Idaho Supreme Court has said that this I.C.R. 52 standard is equivalent to the ordinary harmless error analysis: "If a substantial right is not affected, an abuse of discretion may be deemed harmless. To establish harmless error, the State must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Parker*, 157 Idaho 132, 140, 334 P.3d 806, 814 (2014) (internal

citations and quotations omitted); *see also State v. Perry*, 150 Idaho 209, 221, 245 P.3d 961, 973 (2010) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).[4]

Morin cites portions of Dr. Dawson's testimony that, she asserts, she would have challenged further if given a proper pretrial disclosure. First, Morin contends she would have been better able to respond to Dr. Dawson's opinion that the carboxy-THC in the blood may indicate either chronic use or acute exposure to marijuana. However, this testimony is consistent with and cumulative of testimony that had already been solicited *by Morin* from another witness, the lab analyst. That witness had explained that carboxy-THC may be found in the bloodstream for up to thirty days after marijuana use, that the amount would depend upon frequency of use, and that the mere presence of carboxy-THC could not be used to determine how long ago a person had used marijuana. Accordingly, Morin was not prejudiced by the lack of notice of Dr. Dawson's testimony on this point.

Next, Morin complains of a lack of notice that Dr. Dawson would identify some of the signs of intoxication that would lead him to believe that a person was impaired and would describe possible drug interactions between marijuana and the drugs found in Morin's blood sample. We conclude that Morin was not prejudiced with respect to this testimony. Although the State's discovery response did not include these specifics, Morin was on notice that these subjects would be covered. The disclosure states that Dr. Dawson's testimony would "include information on the effects of the drugs consumed by the defendant in this case." Moreover, defense counsel's argument on her motion to compel acknowledged her anticipation that Dr. Dawson would so testify. Morin's counsel also acquired information used to cross-examine Dr. Dawson, including pharmaceutical fact sheets and the like, as evidenced by her thorough cross-examination. It is also significant that Dr. Dawson spoke with Morin's counsel the week before trial, and told her that he would opine that Morin was "under the influence of marijuana, venlafaxine, and the metabolite of venlafaxine." He explained that he had come to this

---

[4]     On appeal, Morin argues that the district court put the burden of proving harmlessness on her, rather than the State. It is not clear that the district court erred and we need not decide that issue. An appellate court may affirm a lower court's decision on a legal theory different from the one applied by the lower court. *In re Estate of Bagley*, 117 Idaho 1091, 1093, 793 P.2d 1263, 1265 (Ct. App. 1990). To the extent the district court applied an incorrect harmless error analysis, we affirm using the proper analysis.

conclusion after reviewing Corporal Jayne's report and the lab reports. This conversation effectively supplemented the State's discovery disclosures.

Lastly, Morin argues that she was ambushed by testimony concerning venlafaxine. Dr. Dawson testified that central nervous system depressants generally cause abnormal horizontal gaze nystagmus, but that this side effect was not associated with the depressant found in Morin's blood sample, venlafaxine. Morin argues that this opinion is erroneous, that it was inconsistent with Corporal Jayne's general testimony that central nervous system depressants cause horizontal gaze nystagmus, and that Dr. Dawson was unable to cite a source for his contention. It appears that timely disclosure of this opinion would have enabled Morin to more effectively cross-examine Dr. Dawson or Corporal Jayne. If Dr. Dawson's statement was accurate, Morin could have impeached Corporal Jayne and shown the limits of his expertise. If Dr. Dawson's statement was erroneous, she could have impeached Dr. Dawson. But, our determination of harmfulness turns upon the value of this impeachment evidence. Showing that Corporal Jayne did not know the side effects of every type of medication would have been only slightly impeaching. Showing that Dr. Dawson was mistaken (or intentionally dishonest) might have somewhat undermined his effectiveness as an expert witness, but we nonetheless conclude that the error is harmless. The fact that Morin was impaired at the time of her arrest was well established through other witnesses. Corporal Jayne's testimony tended to rule out venlafaxine as the cause of the intoxication, while Dr. Dawson's testimony did not. However, whether Morin was under the influence of both venlafaxine and marijuana or only marijuana was not a material issue, as proof of a singular intoxicating agent was not required for the State to prove Morin's guilt. Because the value of this impeachment evidence was so limited, we conclude beyond a reasonable doubt that the lack of pretrial disclosure of Dr. Dawson's testimony regarding venlafaxine did not contribute to the verdict. Therefore, the district court correctly held that the error was harmless.

In light of this conclusion, we need not separately address Morin's assertion that the inadequate discovery response violated his right to due process. Certainly due process requires that a defendant be afforded "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). Here, because we conclude that the error was harmless, the error was not so prejudicial that it deprived Morin of an opportunity to present a defense.

**C.     Evidence Concerning Carboxy-THC Was Properly Admitted**

The State presented evidence that carboxy-THC was found in Morin's blood. On appeal, Morin argues that this evidence should have been excluded as irrelevant because carboxy-THC is not an intoxicant. She also argues that the opinions given by Dr. Dawson and Corporal Jayne should be excluded because they were based, at least in part, upon the carboxy-THC evidence.

The Idaho Supreme Court has recognized that carboxy-THC is not an intoxicant, *Reisenauer v. State, Dep't of Transp.*, 145 Idaho 948, 950-51, 188 P.3d 890, 892-93 (2008), but, *Reisenauer* does not hold that evidence concerning carboxy-THC is irrelevant in a criminal trial. That case was an appeal from the administrative suspension of Reisenauer's driver's license because he gave a urine sample that tested positive for carboxy-THC. Under the applicable law, I.C. § 18-8002A(4), administrative license suspension required proof that the driver submitted to evidentiary testing "and the results of the test indicate . . . the presence of drugs or other intoxicating substances." The Supreme Court held that evidence of carboxy-THC in a driver's blood did not support suspension of Reisenauer's license because carboxy-THC was neither a drug nor intoxicating. This case, unlike *Reisenauer*, does not turn upon whether Morin failed a drug test, and accordingly, the disposition in *Reisenauer* is not applicable here.

The statute under which Morin was charged, Idaho Code section 18-8004(1)(a), prohibits driving "under the influence of alcohol, drugs or any other intoxicating substances, or any combination of alcohol, drugs and/or any other intoxicating substances . . . ." In a prosecution under that statute, carboxy-THC evidence is relevant when the State also presents evidence of present marijuana impairment. In *State v. Stark*, 157 Idaho 29, 333 P.3d 844 (Ct. App. 2013), we explained:

> A person is under the influence, for purposes of section 18-8004, if the person's ability to drive is impaired in some identifiable way by alcohol, drugs, intoxicating substances, or some combination thereof. The State may prove that a person is under the influence of alcohol, drugs, or an intoxicating substance by a totality of the evidence. A totality of the evidence has been defined to encompass circumstantial evidence of impaired driving ability or other observable symptoms of intoxication. However, to prove that a person is guilty of driving under the influence, the State must prove more than a driving impairment. The State must also present evidence, besides the impairment itself, to prove that the impairment was caused by alcohol, drugs, or intoxicating substances. *See* I.C. § 18-8004(a)(1). In other words, proving an impairment does not prove the cause of the impairment.

10

*Stark*, 157 Idaho at 31, 333 P.3d at 846 (citations and quotation marks omitted). We then held that the State had provided sufficient evidence of impairment, but that the State's evidence of carboxy-THC in the defendant's blood was not sufficient to prove that marijuana use caused the impairment. We explained that while evidence of the presence of carboxy-THC in a blood sample showed past marijuana use, such evidence of past drug use would be relevant to a charge of driving under the influence of that drug only if the State proves a connection between the past drug use and a driver's impairment when the motor vehicle was operated. *Id.* at 33, 333 P.3d at 848. We concluded that the State had not provided the required connection in Stark's case.

In this case, by contrast, the State linked the evidence of carboxy-THC in Morin's blood to her impairment. The State presented evidence that Morin was impaired: she slurred her speech, gave strange responses to an officer's questions, and failed numerous field sobriety tests; and the State linked this intoxication to marijuana use through both the carboxy-THC evidence and other evidence that Morin's appearance and behavior were indicative of marijuana intoxication. Witnesses indicated that Morin's pupils were dilated, she had abnormal eye tremors, her tongue had a yellow-green coating, and she failed a "lack of convergence" test. There was testimony that each of these factors indicated that Morin was under the influence of marijuana. The carboxy-THC evidence supported this theory by showing that Morin had indeed used marijuana. Thus, although as we held in *Stark*, carboxy-THC evidence, standing alone, is not sufficient to prove that marijuana use was the cause of intoxication, carboxy-THC evidence is relevant when combined with other evidence indicating the driver's recent marijuana use. The Idaho Rules of Evidence do not require that any particular piece of evidence completely prove the proponent's case. Rather, evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401. Evidence that carboxy-THC was found in an impaired person's bloodstream makes it more likely that marijuana use caused the impairment. Accordingly, the carboxy-THC evidence and associated testimony of Corporal Jayne and Dr. Dawson were relevant.

## III.

## CONCLUSION

We hold that the State's discovery response was deficient as a matter of law, but that the deficiency does not warrant reversal. We also hold that the evidence showing that there was

11

carboxy-THC in Morin's bloodstream was relevant and properly admitted. Therefore, we affirm the appellate decision of the district court affirming Morin's judgment of conviction.

Chief Judge MELANSON and Judge GUTIERREZ **CONCUR.**